IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


DAVID V. WILDE,                    )
                                   )
          Plaintiff,               )
                                   )
                                   )     Case No. 06-04104-CV-C-NKL
                                   )
DATA COMM, INC., et al.,           )
                                   )
          Defendants.              )


## ORDER

David V. Wilde ("Wilde") brings this action under the Employee Retirement

Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq*., against his former employer

Data Comm, Inc. ("Data Comm"), to recover benefits under a deferred compensation

agreement.  Data Comm asserts that Wilde is not entitled to those benefits because he was

terminated.  Wilde moves for partial summary judgment that he is entitled to receive at

least 50% of the vested portion of the deferred compensation account [Doc. # 53]; Data

Comm moves for summary judgment based on the agreement's terms [Doc. # 55].  This

Court now grants partial summary judgment for Wilde.  The Court also grants partial

summary judgment for Defendants, deciding the deferred compensation plan falls within

ERISA's top hat exception.

## I.    Factual Background

Wilde began his employment with Data Comm in 1979, and by 1987 he was

1

manager of the Business Systems Division. Sometime in 1987, Wilde had an opportunity to take a new job in Oklahoma. Donald Graves ("Graves"), then-president of Data Comm, wanted to retain Wilde, so created a deferred compensation plan (the "plan") as an incentive for Wilde to remain with the company. On June 1, 1987, Wilde and Graves entered into the Unfunded Deferred Compensation Agreement (the "Agreement"). As a result, Wilde stayed with Data Comm.

According to paragraph 4 of the Agreement, Wilde was to receive retirement benefits under the following conditions:

> Upon the Employee's retirement, death, or disability, the Employer will begin paying the Employee a retirement benefit as described in paragraph 5, the amount of such retirement benefit to be based on the amount then credited to the special unfunded deferred compensation account maintained for the Employee on the Employer's books. For purposes of this Agreement, Employee's retirement shall be the date of termination of employment after he reaches the proscribed retirement age in the company policy manual. Disability shall have the same meaning as defined by the employer policy manual.

Paragraph 5 describes the "method of payment":

> The cash and/or other property in the Compensation Account may be distributed as a retirement benefit to Employee upon termination of his services for a reason other than his death, or to the beneficiary or contingent beneficiary designated on the Beneficiary Designation Form (Exhibit B) or to Employee's Personal Representative, if no beneficiary is designated in the event of Employee's death, in accordance with any of the following methods of payment determined solely by Employer:
>
> a) substantial equal consecutive monthly payments for a designated period;
> b) substantially equal consecutive monthly payments for Employee's lifetime, or for the lifetime of the designated beneficiary or contingent beneficiary if Employee is deceased,

2

with a stated certain guaranteed minimum number of
payments; or

    c)       a lump sum single payment of the entire Compensation Account.

The retirement benefits hereunder shall be payable on or shall begin, as the
case may be, on the fifteenth day of the first month next following
Employee's retirement, death, disability, or termination of services. If
Employee shall die before termination of his services hereunder and before
the entire amount in the Compensation Account has been distributed to him,
Employer shall continue to pay to the beneficiary or contingent beneficiary
designated on the Designation of Beneficiary Form executed by the
Employee, any amounts under the selected Method of Payment which
would have been payable to Employee, had he lived.

The Agreement notes that the retirement benefits "are payable solely from the general

assets of the Employer" with Wilde having no interest in the deferred compensation

account or any of Data Comm's assets. Further the Agreement provides (in a section

entitled "Vesting of Benefits") that benefits will vest to Wilde after five years of

employment from the date of the Agreement, with Wilde receiving 100% of the benefits

if he uses the funds to acquire common stock or if the common stock is sold to outside

investors above the net book value, but only receiving 50% of the benefits "for any reason

other than mentioned in paragraph '8a or b' above." Vested benefits were to be

determined every five years of completed employment, except if Wilde decided to use the

funds to acquire Data Comm stock, in which case the benefits were determined at the

Agreement anniversary date.

Additionally, the Agreement states it may be terminated by either party with

60-days' written notice, although "[t]ermiantion of this agreement shall not affect the

accrued retirement benefits." However, termination of the Agreement did not

3

automatically result in Wilde receiving benefits, "said retirement benefits being payable only upon the happening of the events referred to in paragraph 4 of this Agreement." Paragraph 11 makes clear the Agreement is in addition to Wilde's other employment agreements:

> This agreement shall be in addition to and not in substitution of other employment agreements that may presently be in or come into existence between the Employee and the Employer; and this agreement is not intended to alter or modify such agreements, except insofar as it provides for deferred compensation upon the occurrence of termination of employment, retirement, death, or disability under the circumstances herein described. Nothing contained in this agreement shall be construed as a right or as a limitation on the right of the Employer to discharge the Employee for its employment, with or without cause.

The Agreement does not contain a clause appointing a plan administrator or giving the plan administrator discretion to interpret the plan. In funding the plan, certain money was set aside, although it was never placed or invested in either Wilde's or the plan's name.

In 1993, Graves sold his Data Comm shares, leaving Joseph Birk ("Birk") and Roger Langendoerfer ("Langendoerfer") as the remaining, equal shareholders. On March 1, 1996, Data Comm redeemed Langendoerfer's common stock shares, leaving Birk as the sole shareholder. In order to effectuate this redemption, however, Wilde agreed to waive his right to purchase Data Comm stock and to modify the Agreement. Under the modified Agreement, any plan funds Data Comm had segregated were merged back into its general assets, "although the total amount 'vested' shall continue to be shown as a liability on the company books." Additionally, Data Comm would stop contributing to the plan on May 31, 1997, but the money in the account would continue to accrue interest

4

until May 31, 2007.  Finally, the modified Agreement stated that Wilde had the right to apply 100% of the amount "vested" in acquiring Data Comm stock, "but he shall have the right to receive only 50% of that amount upon the occurrence of any other event that triggers the payment obligations under the terms of the plan."  Other than these changes, the rest of the Agreement's terms were still in effect.  By September 3, 2002, Data Comm's accountant informed Birk that Wilde had completed 15-years employment under the plan, with the deferred compensation account totaling $241,645.97.

On January 26, 2004, Birk, then President of Data Comm, notified Wilde that his employment was terminated as of February 29, 2004, and that the Agreement was terminated as of March 26, 2004.  At the time of his termination, Wilde was 48 years old. On June 3, 2004, Wilde notified Birk that he wanted his deferred compensation account rolled over to his bank.  On July 7, 2004, Birk and his wife Judy, as sole directors of Data Comm, executed a unanimous consent appointing Birk the plan's administrator and granting him discretionary authority and responsibility to interpret the Agreement, to hear claims under the Agreement, and to hear appeals of denied claims.  On July 22, 2004, Birk informed Wilde he would schedule a hearing on Wilde's claim.  On August 31, 2004, Birk denied Wilde's claim, relying on paragraph 4 of the Agreement that Wilde was only entitled to benefits upon retirement, death or disability.  Wilde appealed and Birk again denied the claim on February 24, 2005, stating Wilde was not entitled to benefits "upon a termination of employment other than retirement, death or disability."

## II.    Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp*., 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citing *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir. 1983)).

## III.    Discussion

### A.    Standard of Review

Data Comm argues that although de novo review is the correct standard, the Court

6

should ultimately determine whether Birk's decision to deny the claim was reasonable because he was granted discretion by the Agreement, which "must be given effect as ordinary contract principles would require." *Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir. 2006). However, nothing in the original Agreement or in the 1996 amendments grants Birk this discretion; it was only on July 7, 2004—over three months after Wilde's termination and over two months after the termination of the plan—that he was granted discretion to interpret the plan, and that was only through a resolution passed unilaterally by Birk and his wife. It makes little sense under any theory of contract interpretation that a party may retroactively, unilaterally amend, to its own benefit, an agreement that has already been terminated. *Cf. Winterrowd v. Am. Gen. Annuity Ins. Co.*, 321 F.3d 933, 938 (9th Cir. 2003) (explaining retroactive amendments to benefit plan made more than year after affected employees had been terminated were not valid because purpose and intended effect was to advantage of employer and to detriment of employees). Also, under general contract principals, "one party to a contract cannot alter its terms unilaterally or without assent of the other party." *Trostel v. Am. Life & Cas. Ins. Co.*, 168 F.3d 1105, 1109 (8th Cir. 1999) (applying Iowa contract law).

More importantly, *Craig v. Pillsbury Non-Qualified Pension Plan*, the case relied on by Data Comm, suggests that de novo is the correct standard in this situation. In *Craig*, the court found that a plan administrator's decision must be determined for reasonableness because the terms of the plan expressly granted the administrator discretion to interpret its terms. See 458 F.3d at 752 (citing *Goldstein v. Johnson &*

7

*Johnson*, 251 F.3d 433, 443 (3d Cir. 2001) (distinguishing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), because top hat plan administrator has no fiduciary responsibilities)). "Ordinary contract principles require that, where one party is granted discretion under the terms of the contract, that discretion must be exercised in good faith—a requirement that includes the duty to exercise the discretion reasonably." *Id.* Here, the Agreement did not grant Birk discretion to interpret its terms, and he cannot unilaterally grant himself this discretion two months after the Agreement has been terminated and one month after Wilde requested his deferred compensation. *See Goldstein*, 251 F.3d at 443 ("Thus, we believe that, in accordance with our earlier precedent, top hat plans should be treated as unilateral contracts, and neither party's interpretation should be given precedence over the other's, except in accordance with ordinary contract principles."). Thus, this Court reviews the Agreement de novo.

## B. Interpretation of the Agreement

In interpreting an ERISA plan, the Court first applies ordinary principles of contract interpretation. *See Delk v. Durham Life Ins. Co.*, 959 F.2d 104, 105 (8th Cir. 1992). "The federal courts apply federal common law rules of contract interpretation to discern the meaning of the terms in an ERISA plan . . . and under federal common law 'a contract should be interpreted as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.'" *Harris v. The Epoch Group, L.C.*, 357 F.3d 822, 825 (8th Cir. 2004) (citations omitted). In deciding whether a contract is ambiguous, it must be considered in

8

its entirety and not "interpreted phrase by phrase." *Whitebox Convertible Arbitrage Partners, L.P. v. IVAX Corp.*, 482 F.3d 1018, 1021 (8th Cir. 2007).

If the Court finds the plan's language ambiguous, it may then look to extrinsic evidence to help resolve those ambiguities and to determine the meaning of the contract, although "the meaning derived does not amount to an oral modification but is instead a clarification of provisions already in effect." *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 657 (8th Cir. 1992); *see also Delk*, 959 F.2d at 105. If the language remains ambiguous after examining extrinsic evidence, the ambiguities may be construed against the drafter. *See Delk*, 959 F.2d at 105-06; *Taylor v. Cont'l Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1233 (3d Cir. 1991)) (expanding on *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F2d 150 (8th Cir. 1990)).

1. *The Agreement's language is ambiguous.*

Paragraph 4 of the Agreement states that "[u]pon the Employee's retirement, death, or disability, the Employer will begin paying the Employee a retirement benefit as described in paragraph 5 . . . ." The term "retirement" is defined as: "the date of termination of employment after he reaches the prescribed retirement age in the company policy manual." The company policy manual describes the retirement age as 55 with at least 10 years of service. Plainly reading paragraph 4, it appears that retirement benefits would be paid to Wilde upon one of three occurrences: (1) his death; (2) his becoming disabled; or (3) his retirement at age 55 or later. If used in conjunction with Data Comm's suggestion that the Court apply the *expressio unius* maxim, the plain reading of

9

paragraph 4 would not allow Wilde to collect benefits even if he voluntarily left Data Comm, or retired, prior to turning 55 years old.

Data Comm would like the Court to consider only paragraph 4 in determining ambiguity, along with paragraph 9 which states that "no retirement benefits shall be payable to Employee on account of the termination of this Agreement, said retirement benefits being payable only upon the happening of the events referred to in paragraph 4 of this Agreement."  However, the Court is required to consider the Agreement in its entirety, not "phrase by phrase."  Paragraph 5, dealing with "method of payment," states that retirement benefits shall be payable on or shall begin "on the fifteenth day of the first month next following Employee's retirement, death, disability, or termination of services."  Presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous, the phrase "termination of services" must mean something in addition to retirement, death, or disability.  Further, Data Comm's argument that paragraph 5's inclusion of "termination of services" refers to an intent to defer payments of any "*disability*-based benefit until Mr. Wilde's actual termination of employment" is illogical.  The word "or" preceded by a comma clearly indicates "termination of services" is separate and apart from "disability."  *See Kansas City Life Ins. Co. v. Wells*, 133 F.2d 224, 227 (8th Cir. 1943) (dismissing defendant's argument that a comma should not be construed in determining ambiguity and stating, "It is true that punctuation is not a part of the English language, but the court in interpreting a contract cannot ignore either the punctuation or the grammatical construction of the

10

language used").

Moreover, paragraph 11 states that the Agreement does not modify other employment agreements, "except insofar as it provides for deferred compensation upon the occurrence of termination of employment, retirement, death, or disability under the circumstances herein described." Again, in this paragraph, "termination of employment" must mean something other than retirement, death, or disability, especially in light of it being referred to as an "occurrence." However, nowhere in the Agreement is the term defined or used in a way to explain its meaning. Also, Data Comm's argument that it refers to the form or timing of payment does not make sense considering it is again separated by the serial comma.[1]

Data Comm applies the *expressio unius* maxim of interpretation and suggests that the only occurrences qualifying for retirement benefits under paragraph 4 are retirement, death, or disability. However, this approach results in making "termination of services," as used in paragraph 5 (which is specifically referenced in paragraph 4), as well as "termination of employment" in paragraph 11, superfluous. *See Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 179 (1st Cir. 1995) (stating in ERISA case that *expressio unius* maxim carries weight but is not dispositive, and inferring that where additional items are "lurking beyond the enumerated list" it may not be appropriate). The

---

[1]The words "services" and "employment" have sufficiently similar ordinary meanings, in this context, to not be distinguishable. *Compare* Webster's Third New International Dictionary 743 (1971) definition of "employment"), *with id.* at 2075 (definition of "servies"). Thus, the Court will treat them interchangeably.

Case 2:06-cv-04104-NKL   Document 66   Filed 10/05/07   Page 11 of 21

Court agrees with Data Comm that "termination of services" in paragraph 5 does not, by itself, create another occurrence. However, it does suggest—in conjunction with paragraph 11 which expressly labels "termination of employment" as an occurrence—that perhaps termination of employment/services was accidently left out of paragraph 4. Thus, because it is presumed that no provision is superfluous, the Agreement's language is ambiguous and the Court must consider extrinsic evidence in its attempt to resolve the ambiguity.

   2. *Extrinsic evidence suggests parties intended other occurrences.*

     a. *The parties' understanding of the Agreement.*

  The record shows that the parties assumed if Wilde voluntarily left the company, he would be entitled to at least 50% of his deferred compensation. A June 24, 1987, letter from Graves, Birk and Langendoerfer to Wilde, states:

> After each five year employment period you will be able to use 100% of the [deferred compensation account] to acquire common stock owned by Joe Birk and Roger Langendoerfer under the terms of the first right of refusal agreement outlined later in this letter. If you choose to leave the Company voluntarily and not use the funds to acquire Data Comm common stock, 50% of the [deferred compensation account] will stay with Data Comm and 50% will be provided to you. Please bear in mind that vesting only increases after each five year period. For example, if you leave in year seven, the [deferred compensation account] at the end of year five is used for vesting purposes.

This letter is nearly contemporaneous with the Agreement, and it indicates that the parties believed Wilde was entitled to half the deferred compensation if he voluntarily left Data Comm. In his deposition, Graves testified that his understanding in 1992 was that if

Case 2:06-cv-04104-NKL Document 66 Filed 10/05/07 Page 12 of 21

Wilde voluntarily left, he would be entitled to 50% of the deferred compensation, but that if Data Comm had not renewed Wilde's contract, Wilde would have been entitled to "[a]ll of it." Graves explained the purpose of the Agreement was to keep Wilde at Data Comm, and that the Agreement was supposed to create a 50% penalty if he decided to leave. Graves also stated in a 2004 affidavit that it was the intent of the Agreement that if Wilde voluntarily terminated his employment, he would only receive 50% of the vested compensation account, and that Wilde would also be entitled to benefits under the Agreement if Data Comm terminated his employment without cause.

Langendoerfer explained in a 2007 affidavit that he believed the intent of the Agreement was that if Wilde voluntarily terminated his employment, "he would receive a benefit equal to 50% of the then-vested Compensation Account." Also, he stated Wilde could have used 100% of the then-vested funds to acquire Data Comm stock. If Wilde was involuntarily terminated, Langendoerfer stated it was his understanding Wilde would be entitled to 100% of the funds "because, in that circumstance, David would not have the opportunity to use the funds to purchase Data Comm, Inc. stock."

Moreover, Birk himself testified in his deposition that he understood the Agreement would provide Wilde with 50% of the deferred compensation account if Wilde voluntarily left, including if Wilde had voluntarily left the day before he fired him in 2004. He also testified he thought that if Wilde voluntarily left his employment in 1992, five years after the original Agreement was signed, he would have been entitled to 50 percent of the vested amount as of that date. Birk did not think about what would

13

happen if Wilde was involuntarily terminated, forming no opinion about whether he would be denied benefits under such a circumstance until a couple of months before he fired Wilde and after he had consulted his attorney.

Wilde admits he was never told that he would receive his deferred compensation benefits if he was terminated. However, he also stated in his deposition that his understanding was that he was entitled to 50% of the then-vested benefits if his employment ended for any reason, and that no one ever told him that if he were terminated for cause, he would forfeit the entire fund. Further, as part of his divorce in 1995, Wilde's "Property and Maintenance Separation Agreement" states:

> Husband's Deferred Compensation Plan with Data Comm has a current balance of $27,334. However, the same is not a qualified plan and therefore is not subject to a Qualified Domestic Relations Order. Further, the plan is subject to complete divestment if certain conditions outlined by the terms of the plan are not met. If and when Husband receives payment of the now-vested amount, $27,334 from the Deferred Compensation Plan, then he shall pay to Wife fifty percent (50%) of that amount (i.e., $13,667) less the federal and state tax liability that Husband will be required to pay upon receipt of the proceeds. If such payment is made to Husband, he shall immediately notify Wife, the tax computation shall be made, and Husband shall pay to Wife the resulting amount.

In his deposition, Wilde explained he believed that "if and when" meant that he would owe his wife money if he received the retirement benefits in cash; however, if he used the money to purchase Data Comm stock, he would not owe her anything. He also admitted the separation agreement was written by attorneys.

> b.    *Termination of employment is another occurrence.*

In the present case, Data Comm argues it is irrelevant what would have happened

14

if Wilde voluntarily terminated his employment because he was fired.  But, it is relevant to the extent it demonstrates that the parties involved, on the whole, did not believe paragraph 4 of the Agreement was limited only to retirement, death, or disability, with retirement expressly defined as "the date of termination of employment after he reaches the prescribed retirement age in the company policy manual."  Under the express terms, and applying *expressio unius* as Data Comm suggests, Wilde would not have been able to voluntarily "retire" for another seven years after the date he was terminated by Birk.  Thus, the extrinsic evidence demonstrates the parties themselves believed paragraph 4 operated differently than its plain meaning suggests.

Considering the Agreement in its entirety, the fact that the parties believed Wilde could collect at least 50% of the deferred compensation funds if he voluntarily left Data Comm leads credence to the theory that "termination of employment/services," as used in paragraphs 5 and 11, was accidently left out of paragraph 4.  Adding "termination of employment" along with "retirement, death, or disability" to paragraph 4 gives meaning to all provisions in the Agreement.  Thus, based on the extrinsic evidence of the parties' understandings, the Court believes that Graves and Wilde, the original parties to the Agreement, intended paragraph 4 to also include "termination of employment."[2]  The next

---

[2]The Court has addressed this issue as a contract interpretation problem and not a reformation.  *Compare* RESTATEMENT (SECOND) OF CONTRACTS § 212, illus. 2, and RESTATEMENT (SECOND) OF CONTRACTS § 155(b), illus. 7.  However, the same analysis applicable to the interpretation of the contract would require the contract to be reformed similarly to reflect the actual agreement of the parties.  Therefore, it does not matter which analysis is applied.

question, however, is whether the Agreement provided for "involuntary" termination of employment.

         *c.*     *Agreement includes involuntary termination of employment.*

Data Comm is correct in noting that the deposition testimony and affidavits generally state that the parties assumed Wilde was entitled to benefits if he voluntarily left. Data Comm implies that this means the parties did not intend to include involuntary termination as part of the Agreement. This is contrary to the testimony by Graves, one of the original parties to the Agreement, who stated he understood the Agreement to provide Wilde with "all" of the benefits if Wilde was fired, as well as Langendoerfer's affidavit supporting the same understanding. Birk himself admitted he never considered what would happen under the Agreement if Wilde were fired. Moreover, although it includes the word "termination," the Agreement does not distinguish between "voluntary" and "involuntary" termination. And while the Court may look to extrinsic evidence where the contract's language is ambiguous, there is no need to do so here regarding the phrase "termination of employment." *See Craig*, 458 F.3d at 753 ("We are unaware of any contract principles under which the resolution of one ambiguity in a contract permits a party to adopt an entirely different meaning for other parts of the contract that are otherwise unambiguous.").

There is no reason to assume that "termination," as used in the Agreement, means only voluntary termination. Under de novo review, the Court interprets the term of the plan by "giving the language its common and ordinary meaning as a reasonable person in

16

the position of the [plan] participant, not the actual participant, would have understood the words to mean." *Adams v. Cont'l Cas. Co.*, 364 F.3d 952, 954 (8th Cir. 2004) (quoting *Hughes v. 3M Retiree Med. Plan*, 281 F.3d 786, 789-90 (8th Cir. 2002)). Applying this standard, a reasonable person in the position of the plan participant would understand "termination" to include involuntary termination. In fact, "firing" is probably the first definition that would come to a reasonable person's mind. This understanding is confirmed by the dictionary definition of "terminate," meaning "to discontinue the employment of: Discharge." Webster's Third New International Dictionary 2359. But because the Agreement also includes "termination of employment" as part of the definition of "retirement," a reasonable person could assume it also means voluntarily leaving the company. Thus, the Agreement's language, combined with a reasonable person's understanding, suggests that "termination" includes both voluntary and involuntary termination.[3]

Finally, allowing Data Comm to completely divest Wilde of his deferred compensation funds through involuntary termination would give Data Comm incentive to fire Wilde before his 55th birthday. It is difficult to imagine the parties would agree to such a scheme without expressly writing it into the Agreement, and the Court will not interpret that meaning through implication and conjecture. Thus, the Court believes the

---

[3]For the same reasons that the Court will not read "voluntary" into the Agreement, it will also not read the Agreement to provide benefits only for termination of employment "without cause." Data Comm implies Birk may have fired Wilde "for cause." Importantly, Birk's January 26, 2004, notice to Wilde makes no reference to any of these claims.

17

extrinsic evidence shows that Graves and Wilde, the original parties to the Agreement, understood that Wilde could receive retirement benefits upon termination of his employment prior to his 55th birthday, and in addition to retirement, death, or disability as listed in paragraph 4. The term "termination," though, is not ambiguous, and the Court applies its ordinary meaning as a reasonable person under the plan would understand it, which includes both voluntary and involuntary termination. The Court does not decide at this time whether Wilde is entitled to 100% of the vested benefits under the Agreement, only that he is entitled to at least 50% of the vested funds in his deferred compensation account.

### C.     The Plan Is Unfunded

Data Comm also argues this case involves an unfunded "top hat" plan under 29 U.S.C. § 1051(2), which exempts such plans from ERISA's vesting requirements. A top hat plan is "a plan which is unfunded and maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2); *see also Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 932 n.6 (8th Cir. 1999). Wilde counters that the plan was funded.

In determining whether a plan is funded, the Eighth Circuit looks to whether there is "the existence of a res separate from the ordinary assets of the corporation." *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1214 (8th Cir. 1981). In *Belsky v. First Nat'l Life Ins. Co.*, 818 F.2d 661 (8th Cir. 1987), the Eighth Circuit distinguished

18

the plan in that case from the one in *Dependahl*:

> First, in addition to death benefits, Belsky's agreement also provides for retirement and disability benefits . . . . More importantly, the agreement does not mandate that the Bank had or would acquire assets to finance the liabilities assumed in the agreement. While it is evident that the Bank obtained the insurance policy with the intention that it could be used in funding the Plan, the language of the Plan, unlike that of the *Dependahl* plan, specifically avoids making a direct tie between the insurance policy and the Plan.

*Id.* at 663. The court then focused on the language of the agreement in determining whether the plan was funded, stating, "We are satisfied that the district court correctly read the agreement between Belsky and the Bank." *Id.*

The language of the Agreement here is very similar to the plan in *Belsky*. First, it is entitled "Unfunded Deferred Compensation Agreement." It states that the "special unfunded deferred compensation account" will be maintained "on the Employee's behalf on the Employer's books." Further, "The Employer and Employee agree that the account described in this paragraph is only a measuring device for determining amounts to be due to the Employee in the future from the general assets of the Employer."

Further, paragraph 7, entitled "Unfunded Nature of Agreement," states:

> Retirement benefits under this Agreement are payable solely from the general assets of the Employer, and the Employee and the Employee's beneficiaries and personal representatives shall have no interest in either the special unfunded deferral compensation account maintained for the Employee and the Employee's beneficiaries and personal representatives shall have no interest in either the special unfunded deferral compensation account maintained for the Employee by the Employer on its books, or any assets of the Employer. No fund or other assets will ever be set aside or segregated for the benefit of the Employee or the Employee's beneficiaries and personal representatives under this Agreement, this Agreement merely

19

granting the Employee a contractual right to receive future benefits. The Agreement also allows Data Comm the discretion to invest, or not invest, the compensation account funds. The Agreement does not mandate that Data Comm had or would acquire assets to finance the liabilities assumed in the Agreement.

Wilde would like the Court to look at how the plan was actually funded—whether the funds were kept separately and whether Data Comm considered those funds untouchable. However, the Court does not believe that it matters if Data Comm actually segregated the funds. Paragraph 7 of the Agreement does not forbid Data Comm from segregating the funds for bookkeeping and investing purposes; instead, this paragraph makes clear that those segregated funds will not be set aside for the benefit for Wilde. In other words, Wilde has no interest in those funds. There is no evidence that assets were invested under Wilde's or the plan's name. There is no evidence Wilde had an interest in a res separate from Data Comm's general assets. Finally, there is no evidence making a direct tie between the segregated funds Wilde complains about and the Plan.

It appears that while Data Comm may have kept the funds separate (at least at some point in time), and may have considered them as separate and belonging to the plan, there is no evidence showing Wilde had an actual interest in that res. Additionally, the Agreement appears to fit within the statutory definition of a top hat plan: It was unfunded and established for the purpose of providing deferred compensation for a select group of management or highly compensated employees (in this case, only Wilde). Finally, the language of the Agreement states that the plan's funds remained under Data

20

Comm's general assets and that the deferred compensation account was only a measuring device. Thus, looking at the language of the Agreement, as required by *Belsky*, the Court determines that the Unfunded Deferred Compensation Agreement is a top hat plan under 29 U.S.C. § 1051(2). *See Belsky*, 818 F.2d at 663 (describing plan language, which is similar to the plan in the present case, and holding that plan was unfunded). Therefore, the Court grants summary judgment for defendants on this issue. The Court does not determine whether this entitles Wilde to 100% of the vested retirement benefits, as defined under the Agreement.

**IV.    Conclusion**

Accordingly, it is hereby

ORDERED that Plaintiff David V. Wilde's Motion for Partial Summary Judgment [Doc. # 53] is GRANTED. It is further

ORDERED that Defendants Joe Birk and Data Comm, Inc.'s Motion for Summary Judgment [Doc. # 55] is GRANTED, in part, and DENIED, in part.


                                        s/ Nanette K Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated: October 5, 2007
Jefferson City, Missouri

Case 2:06-cv-04104-NKL   Document 66   Filed 10/05/07   Page 21 of 21